**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TIMOTHY COX, *et al.*, | |
| Plaintiffs, | Case No. 20-cv-2108 (JMC) |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

John Davis and Timothy Cox filed this case under the Federal Tort Claims Act, alleging that United States Park Police officers used excessive force when arresting them. *See* ECF 7 ¶¶ 40–45. The Court held a two-day bench trial. Based on the testimony and documentary evidence presented at trial, the Court concludes that the force used by the officers was reasonable. The Court therefore enters judgment for the Government. This order describes the Court's findings of fact and separate conclusions of law, as required by Federal Rule of Civil Procedure 52.[1]

## I.   LEGAL STANDARD

When a case is "tried on the facts without a jury," "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The "findings must be 'sufficient to indicate the factual basis for the ultimate conclusion.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 97 (D.D.C. 2020) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)). "But the judge need only make brief, definite, pertinent findings

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Id.* (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment). "[T]he court need not address every factual contention and argumentative detail raised by the parties, or discuss all evidence presented at trial." *Id.*

## II.    FINDINGS OF FACT

Prior to trial, the parties submitted proposed stipulated facts. *See* ECF 49 at 2–4. Those facts were reflected in 24 numbered paragraphs in the joint pretrial statement. *See id.* At trial, plaintiffs' counsel indicated that plaintiffs would not stipulate to two of the proposed facts— paragraphs 21 and 22. *See* Feb. 17 AM Tr. 15:14–16:3. Those two paragraphs concerned the medical expenses incurred by each of the plaintiffs. *See* ECF 49 at 4. Because the trial was bifurcated and concerned only liability, the Court need not and does not make findings related to the plaintiffs' medical expenses. *See* Feb. 17 AM Tr. 3:20–4:21 (reiterating that plaintiffs wanted trial bifurcated). The plaintiffs confirmed that, other than paragraphs 21 and 22, all other stipulations were agreed and could be "enter[ed] for purposes of the record as factual stipulations." *Id.* at 16:4–7. The Court therefore adopts the stipulations in paragraphs 1–20 and 23–24 as part of its findings of fact. Where relevant, it includes those stipulated facts alongside its own findings in describing the events below.

As for the Court's findings, those are based on the testimony of the five witnesses along with the two exhibits admitted into evidence by the plaintiffs and 40 exhibits admitted by the Government. *See* ECF 51; ECF 52 (exhibit lists). The witnesses were the two plaintiffs—the only witnesses during their case in chief—and four law enforcement officers—Donald Greulich, Kenley Bullard, and Carl Hiott of the United States Park Police, and Bryan Adelmeyer of the D.C. Metropolitan Police Department—who testified during the Government's case. The findings are as follows:

1. On the evening of March 27, 2016, Cox and Davis were at a cookout with mutual friends in Washington, D.C. *See* ECF 49 at 2.

2. At some point that day, Cox smoked PCP and drank several 24-ounce beers. *See id.*; Feb. 17 AM Tr. 75:1–5, 75:20–76:5.

3. Early in the morning on March 28, 2016, Cox and Davis left the cookout together in a Dodge Caravan. Davis was driving and Cox was in the front seat. *See* ECF 49 at 2.

4. Davis and Cox were driving from the cookout to Cox's sister's home. Feb. 17 AM Tr. 47:22–23.

5. The Dodge Caravan Davis was driving had a rear license plate that was registered to a different vehicle. *See* ECF 49 at 2.

6. The van did not have a "required front license plate" and had a broken headlight. *Id.*

7. Davis did not have a valid driver's license. *See id.* at 3.

8. At approximately 12:39 AM, Officer Donald Greulich of the United States Park Police saw the minivan and noticed the missing front license plate and broken headlight. *See id.* at 2; Feb. 19 AM Tr. 8:22–9:2. Greulich then ran a check on the license plate on the back of the van and learned that it belonged to a Cadillac, not the Dodge Caravan Davis was driving. *See* Feb. 19 AM Tr. 9:5–14.

9. Greulich briefly followed the van and then initiated a traffic stop by turning on his siren lights. *See* ECF 49 at 2–3; Feb. 19 AM Tr. 9:24–10:17. Greulich was driving a "fully-marked U.S. Park Police cruiser with roof overhead lights, which are red and blue." Feb. 19 AM Tr. 10:10–12. Greulich did not have a partner and was alone in his cruiser. *See id.* at 14:3–5.

10. "Despite seeing Officer Greulich's siren lights, Davis continued driving." ECF 49 at 3. Davis made at least one turn after seeing Greulich's lights, and then stopped in front of Cox's sister's home. *See* Feb. 19 AM Tr. 10:23–11:7; Gov't Ex. D40 (marked map); ECF 49 at 3.

11. After the van stopped, Cox immediately exited the vehicle, ran towards the door of her sister's home, and announced that she was going inside the home. *See* ECF 49 at 3.

12. Davis also exited the vehicle and walked toward the passenger side of Officer Greulich's car. *See* Feb. 19 AM Tr. 12:5–18. As Davis came towards Greulich's car, Greulich used his radio to call for backup, "advis[ing] that" Cox and Davis "were exiting the vehicle." *Id.* at 17:6–11.

13. Greulich then asked Davis for his license and registration, but Davis did not comply. *See id.* at 12:25–13:3.

14. Greulich at that point attempted to detain Davis. He had Davis place his hands on the van. *See id.* at 13:5–9.

15. Davis, however, began to resist. When Greulich attempted to place Davis's hands behind his back to put handcuffs on him, Davis clenched up his arms and fists. *See id.* at 13:5–12.

16. Davis and Greulich began to physically struggle with each other. In the course of that struggle, they ended up on the ground. *See id.* at 28:1–25.

17. Greulich did not have the chance to pat Davis down before their struggle began and they ended up on the ground. *See id.* at 41:12–20.

18. Once on the ground, Davis was face down and Greulich was behind and a little to the side of him "trying to gain control of" Davis's arm. *Id.* at 29:6–15.

4

19. While Greulich and Davis were on the ground struggling, Greulich again called for backup and "advised over [his] radio that the struggle was ensuing." *Id.* at 17:11–12.

20. Greulich told Davis that if he "continue[d] to resist [Greulich's] attempts to detain him, [Greulich] was going to deploy [his] taser." *Id.* at 13:16–18.

21. Greulich warned Davis "at least three times" that he would use his taser if Davis did not stop resisting, but Davis "continued to resist." *Id.* at 13:20–21.

22. Greulich then tased Davis in the back. *See id.* at 15:17–22.

23. Davis continued to resist after Greulich deployed his taser. *See id.* at 16:18–19.

24. So Greulich pulled the trigger on his taser again, sending another "five-second electric shock" "down the wires and into . . . Davis." *Id.* at 16:20–17:3.

25. Davis was not in handcuffs when Greulich tased him. *See* Feb. 17 AM Tr. 27:13–19.

26. After Greulich tased Davis the second time, Davis complied and Greulich was able to put handcuffs on Davis. *See id.*; Feb. 19 AM Tr. 17:4–5.

27. While Greulich and Davis were struggling on the ground, Cox told Greulich from Cox's sister's porch that Greulich was "not going to arrest" Davis. Feb. 19 AM Tr. 14:16–17.

28. Cox threw a cooler at Greulich and then came down into the yard, picked up two hula hoops, and threw those at Greulich. *See id.* at 14:15–20; ECF 49 at 3.

29. The cooler did not hit Greulich, but one of the two hula hoops did. *See* Feb. 19 AM Tr. 14:21–24; ECF 49 at 3.

30. Shortly after Greulich put Davis in handcuffs, Officer Kenley Bullard of the Park Police and an officer from the D.C. Metropolitan Police Department arrived on the scene. *See* Feb. 19 AM Tr. 17:19–18:5; Feb. 17 PM Tr. 13:9–23.

31. At that point, Cox was on the porch of the house. *See* Feb. 17 PM Tr. 14:3–7; ECF 49 at 3. Greulich pointed towards Cox and told Bullard that Cox "was the individual that assaulted" Greulich. Feb. 17 PM Tr. 14:13–14. Greulich told Bullard to detain Cox. *See id.*

32. Bullard then walked towards Cox and told Cox to stop several times. *See id.* at 16:17–24. Bullard made it onto the porch and had a hand on Cox's wrist, but Cox "snatched" her wrist away and made it inside of the house. *Id.* at 17:1–10.

33. The Metropolitan Police Department officer stayed outside with Davis, and Greulich joined Bullard on the porch. *See id.* at 18:7–9; Feb. 19 AM Tr. 18:5–8.

34. Bullard and Greulich knocked on the door of the home and Cox's sister opened the door and allowed them to enter by stepping aside so that the officers could walk in. *See* Feb. 19 AM Tr. 18:4–9; Feb. 17 PM Tr. 18:22–25; ECF 49 at 4.

35. When Bullard and Greulich went inside, they saw Cox at the back of the living room. *See* Feb. 19 AM Tr. 18:17–18. The only light in the house was coming from the TV in that living room. *See* Feb. 17 PM Tr. 19:5–12.

36. Cox saw Bullard and Greulich come in the house and moved from the living room into the dining room and then into another room off the dining room. *See* Feb. 19 AM Tr. 18:17–20.

37. Bullard and Greulich went after Cox and found her in that room off the dining room. *See id.* at 18:17–25.

38. The officers attempted to take Cox into custody, but she resisted. *See id.* at 18:25–19:1. Cox "kick[ed] and thrash[ed]" her arms "in a violent manner," while the officers told her to "[s]top resisting." Feb. 17 PM Tr. 19:25–20:9.

39. The officers were standing about three feet from Cox as she threw her hands and kicked wildly. *See id.* at 20:15–21:1.

40. Based on his experience, Bullard thought Cox might "be under the influence." *Id.* at 21:21–23. That conclusion was based on Cox's "irrational behavior," her failure to follow "verbal commands," her prior assault of Greulich with the hula hoops and cooler, and Cox having violently "snatched" away from Bullard. *Id.* at 21:25–22:3.

41. Greulich told Cox that if she "didn't stop resisting," Greulich would use his taser. Feb. 19 AM Tr. 19:6–7.

42. Greulich then pulled his taser up, but Cox hit Greulich in the hand and knocked the taser out of his hand. *See id.* at 19:6–8.

43. Next, Bullard warned Cox that Bullard was going to use his pepper spray. *See id.* at 19:8–10.

44. Bullard was face-to-face with Cox at this point. *See id.* 19:11–12. When Bullard took out his pepper spray and brought it up to deploy it, Cox grabbed Bullard's hand "and pushed the pepper spray over" so that it was pointed towards Greulich. *Id.* at 19:11–15.

45. Because Cox had grabbed Bullard's hand, Bullard inadvertently pepper sprayed Greulich in the face. *See id.*; Feb. 17 PM Tr. 23:20–24. After he deployed it, Bullard dropped the can of pepper spray. *See* Feb. 17 PM Tr. 26:14–20.

46. After he was pepper sprayed, Greulich could not see. *See* Feb. 19 AM Tr. 19:18–19. Because he was "rendered . . . ineffective," Greulich "backed out of the room" before leaving the house altogether. Feb. 17 PM Tr. 23:22–24, 25:15–16; *see* Feb. 19 AM Tr. 19:22–23.

47. Bullard was now alone in the room with Cox. *See* Feb. 17 PM Tr. 25:15–18.

48. Bullard moved towards Cox and attempted to grab her hands. *See id.* at 25:21–23.

49. When he did so, Cox "reached down with one of [her] free hands and grabbed [Bullard's] penis and squeezed." *Id.* at 25:24–26:1.

50. Bullard felt "excruciating pain" and was worried that he would be "rendered defenseless" if he did not get Cox's hands off of him. *Id.* at 26:8–11.

51. "[F]earing for [his] safety," Bullard pushed Cox back to "render [his] penis free" and then punched Cox in the face with a closed fist. *Id.* at 27:1–7.

52. At the time Bullard punched Cox, he had already dropped his pepper spray. *See id.* at 28:1–3. And both because of how dark the room was and because of how close together Cox and Bullard were standing, Bullard could not use his baton effectively. *See id.* at 27:22–28:8. The only other "defensive equipment" Bullard had on him at the time was his firearm. *Id.* at 28:9–13. Bullard decided to use his fist rather than his firearm. *See id.* at 28:16–18.

53. After Bullard hit Cox, Cox fell to the ground and Bullard got on top of her. *See id.* at 28:23–25. Because Cox's back had been to the wall when Bullard hit her, Cox "fell straight down" and ended up with her back against the ground. *Id.* at 39:21–22, 29:12–14. Bullard then got on top of Cox on her stomach so that the two were face-to-face. *See id.* at 29:15–19.

54. Bullard was able to grab one of Cox's arms and get one cuff on. *See id.* at 28:23–25.

55. But Cox continued to thrash and kick. *See id.* at 29:1–3. In doing so, Cox kicked a closet door and knocked it off its hinges. *See id.* The door fell on top of Bullard and Cox on the floor. *See id.*

8

56. After the door fell, Bullard—at this point exhausted—laid on top of Cox to try to keep Cox still. *See id.* at 30:12–22.

57. Using his body weight, Bullard kept Cox from getting up and laid there on the ground until another Metropolitan Police Department officer, Bryan Adelmeyer, arrived on the scene. *See id.* at 31:12–32:7; Feb. 19 AM Tr. 50:8–23.

58. Adelmeyer came into the room where Bullard and Cox were and saw that a taser was on the ground and the closet door was off of its hinges. *See* Feb. 19 AM Tr. 50:16–18, 52:6–12. He also saw Bullard on the ground "wrestling" with Cox. *Id.* at 50:21–23.

59. Bullard yelled for Adelmeyer's help. *See id.* at 50:19–51:5. Adelmeyer bent down to help Bullard subdue Cox, and Cox kicked him in the face. *See id.* at 51:6–8.

60. After Cox kicked him, Adelmeyer managed to grab one of Cox's arms and help Bullard restrain her. *See id.* at 51:6–12.

61. Eventually, a third officer came into the room and at that point the officers were able to put the second handcuff on Cox. *See* Feb. 17 PM Tr. 33:8–18.

62. After the closed-fist punch that knocked Cox to the ground, Bullard never hit Cox again. *See id.* at 36:14–17.

63. Bullard's punch injured one of Cox's eyes. *See* Feb. 19 AM Tr. 40:20–24.

## III.    CONCLUSIONS OF LAW

"Tort liability under the [Federal Tort Claims Act] is determined according to the law of the place where the alleged acts or omissions occurred—in this case, the District of Columbia." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911 (D.C. Cir. 2015). The plaintiffs in this case allege that the officers committed the torts of assault and battery. *See* ECF 7 ¶¶ 40–45; ECF 49 at 15 (describing plaintiffs' position on applicable law). Under D.C. law, "[a]n assault is an intentional attempt or threat to do physical harm to another." *Harris*, 776 F.3d at 913. "A battery

9

is an intentional act that causes harmful or offensive bodily contact." *Id.* "The police have a qualified privilege to commit both torts when using reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Id.* "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The test is "both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009). In light of the Court's factual findings, the force used against both Davis and Cox was reasonable and Greulich's and Bullard's actions were therefore privileged.

### A. Plaintiff Davis

After Greulich stopped Davis, Davis got out of his van and approached Greulich's car. *See supra* Part II ¶ 12.[2] Davis then refused Greulich's command to hand over his license and registration. *See id.* ¶ 13. So Greulich attempted to detain Davis by having him place his hands on the van. *See id.* ¶ 14. But when Greulich tried to put handcuffs on Davis, Davis resisted by clenching up his arms and fists. *See id.* ¶ 15. As Greulich struggled to get handcuffs on Davis, the two of them ended up wrestling on the ground. *See id.* ¶ 16. At that point, Greulich was alone, Cox was standing in the front yard throwing things at him, and Greulich—because he never had a chance to pat Davis down—did not know if Davis might have a weapon. *See id.* ¶¶ 9, 17, 19, 27–29. Trying to get control of the situation, Greulich warned Davis that if he continued to resist, he

---

[2] The stop is not at issue, but the Court notes that it was lawful. Even setting aside that the rear-license plate on the car was registered to another vehicle, Davis's van had a broken headlamp and was missing a front license plate. *See supra* Part II ¶ 6. D.C. law requires two working headlamps and Maryland law—the van had a rear Maryland license plate, *see* ECF 49 at 2—requires front and rear license plates. *See* D.C. Mun. Regs. Tit. 18, §§ 700.2, 704.1; Md. Code Ann., Transp. §§ 13-410(a)(1)(ii), 13-411(a). Because Officer Greulich had probable cause to believe Davis violated those traffic regulations, the stop was lawful. *See United States v. Sheffield*, 832 F.3d 296, 302 (D.C. Cir. 2016); *United States v. Cogdell*, 297 F. Supp. 2d 11, 13–14 (D.D.C. 2003).

would use his taser. *See id.* ¶ 21. Because Davis still did not comply, Greulich then tased Davis in the back. *See id.* ¶ 22. When that did not work, Greulich tased Davis again. *See id.* ¶ 24. That time the taser worked, and Greulich was able to put handcuffs on Davis. *See id.* ¶ 26.

Greulich's conduct was reasonable. Davis was "actively resisting arrest," and when Greulich deployed the taser he "reasonably believe[d]" that he was "in danger of bodily harm." *Hylton v. District of Columbia*, No. 21-cv-2673, 2025 WL 740454, at *12 (D.D.C. Mar. 7, 2025) (applying D.C. law). He therefore used an amount of force he believed was necessary—the taser— to "protect" himself and "control [Davis's] aggression." *Katz v. District of Columbia*, 285 A.3d 1289, 1319–20 (D.C. 2022). Crucially, Greulich did not use any force against Davis once the resistance stopped and Greulich was able to put on handcuffs. *See supra* Part II ¶¶ 25–26. Given all of that—and mindful that D.C. law "allow[s] for the fact that police officers are often forced to make split-second judgments[] in circumstances that are tense, uncertain, and rapidly evolving"— Greulich's subjective belief about the amount of force that was necessary was not objectively unreasonable when "compared to that of a hypothetical reasonable police officer placed in the same situation." *Hylton*, 2025 WL 740454, at *11.

Davis and Cox, of course, told a different story at trial about what happened to Davis. According to them, Davis did not resist arrest and Greulich tased him out of nowhere. As its findings of fact make clear, however, the Court did not find Cox's and Davis's testimony credible. Davis and Cox both offered testimony that was contradicted by their own factual stipulations— particularly those stipulations that did not reflect so well on them. Davis, for instance, testified that he had a "valid" license, even though it was stipulated that he "did not," in fact, "have a valid driver's license." Feb. 17 AM Tr. 25:1–2; ECF 49 at 3. And Cox testified that she did not "smoke PCP on March 27th, 2018," but stipulated that she did smoke PCP that day. *Compare* Feb. 17 AM

11

Tr 73:6–7, *with* ECF 49 at 2. Davis and Cox also contradicted one another in their testimony. Davis testified that he was not in handcuffs when he was tased, while Cox said she saw handcuffs on Davis before he was tased. *Compare* Feb. 17 AM Tr. 27:13–19, *with id.* at 53:25–54:4, 55:1–3. And both gave testimony that contradicted their depositions. *See, e.g.*, *id.* at 33:23–34:19 (Government impeaching Davis's trial testimony that he did "not consume any illicit drugs" on March 27, 2016, with Davis's deposition); *id.* at 68:9–69:14 (Government impeaching Cox's trial testimony that she "did not consume any alcohol" at the cookout with her deposition testimony). Having observed both on the stand, the Court did not find them to be forthcoming. Based on these inconsistencies and Cox's and Davis's demeanor at trial, the Court did not credit their testimony.

The Court did, on the other hand, credit Greulich's testimony. His testimony was consistent with that of the other officers. All three officers who were on the scene, for instance, gave consistent testimony about Greulich being pepper sprayed in the eyes and leaving the house. *See* Feb. 17 PM Tr. 25:15–18; Feb. 19 AM Tr. 19:22–23; *id.* at 47:23–48:10. And having observed Greulich's demeanor on the stand, the Court found him credible. Because the claims against Greulich—and, as the Court discusses below, the same is true for Bullard—essentially came down to a he-said-she-said, the Court's credibility determination was central to its factual findings.

### B. Plaintiff Cox

By the time Bullard and Greulich made it inside the house looking for Cox, she had already: run from Greulich after he pulled the car over, thrown a cooler and hula hoops at Greulich (one of which hit him), and fled inside the house when Bullard approached her and ordered her to stop. *See supra* Part II ¶¶ 11, 28–29, 32. When Cox saw Bullard and Greulich inside the house, she fled again. *See id.* ¶ 36. Finally, the officers tracked Cox down in one of the house's rooms. *See id.* ¶ 37. They then tried to detain Cox, but she resisted, "kick[ing] and thrash[ing]" her arms "in a violent manner." *Id.* ¶ 38. Given everything that had already happened, Bullard suspected Cox

might be "under the influence" and therefore acting "irrational[ly]." *Id.* ¶ 40. Greulich warned Cox that if she did not stop resisting, he would use his taser. *See id.* ¶ 41. When he held his taser up to use it, Cox knocked it out of his hand. *See id.* ¶ 42. Bullard took the next step, warning Cox that he would use pepper spray. *See id.* ¶ 43. This time, when Bullard held the pepper spray up Cox grabbed his hand and redirected it towards Greulich's face. *See id.* ¶ 44. That led Bullard to spray Greulich in the face, incapacitating him. *See id.* ¶¶ 45–46. Unable to see, Greulich left the house. *See id.* ¶ 46.

Bullard was now alone in the room with Cox, who was still vigorously resisting. *See supra* Part II ¶ 47. Bullard tried to grab Cox's hands, but when he did so Cox managed to grab Bullard's penis and squeeze. *See id.* ¶ 49. That caused Bullard "excruciating pain" and he worried he would be left "defenseless." *Id.* ¶ 50. "[F]earing for [his] safety," Bullard pushed Cox away and punched her in the face with a closed fist. *Id.* ¶ 51. Bullard then got on top of Cox and got one cuff on her, but she continued to kick and resist. *See id.* ¶¶ 53–55. Eventually, Bullard was able to use his body weight to restrain Cox. *See id.* ¶ 57. But still, when another officer—Adelmeyer—came to help Bullard, Cox continued to resist, kicking that officer in the face. *See id.* ¶¶ 57–59. Finally, with the help of a third officer, they managed to get the handcuff on Cox's second wrist and restrain her. *See id.* ¶ 61.

Just as it was with Greulich's use of the taser, Bullard's choice to punch Cox was reasonable. Even before she grabbed Bullard's penis, Cox was "actively resisting arrest" and threatening the officers with her violent kicking and thrashing. *Hylton*, 2025 WL 740454, at *12. She had, by that point, incapacitated Greulich by pointing the pepper spray in his face. When she grabbed Bullard, Cox escalated the threat, causing Bullard to fear that he would be left defenseless and alone with Cox in that room. Because Bullard believed that his baton would not be effective

13

in the environment, he thought that the minimum force he could use to effectuate the arrest and protect himself was the punch he delivered. *See supra* Part II ¶ 52. That belief was not objectively unreasonable given the situation in which Bullard found himself. And, same as it was with Greulich's use of the taser, Bullard did not use force again after he had the situation under control and Cox detained. *See id.* ¶¶ 57, 62. Bullard's use of force was therefore privileged.

Cox's effort to prove that Bullard's actions were not privileged turns on her own testimony at trial. But, as already explained, the Court did not find Cox's testimony about her conduct credible. *See supra* 11–12. The Court adds here that, like with Greulich, the Court found Bullard's testimony credible as well. For one, the account Bullard gave of what happened in the room before he hit Cox did not strike the Court as the kind of story someone would fabricate from thin air. The Court also found Bullard's testimony that he perceived Cox to be under the influence credible. *See supra* Part II ¶ 40. Cox admits that she used PCP and drank alcohol earlier in the day, *see id.* ¶ 2, and Bullard was aware that Cox had thrown things at Greulich while he was arresting Davis, *see id.* ¶ 31. Given Cox's erratic behavior and prior consumption of drugs and alcohol, the Court credits Bullard's testimony about his perception of Cox.

Nor was the Court persuaded by Cox's argument in her closing that the Court should not credit Bullard's testimony because while he claims that he only punched Cox once, and did so with his right hand, Cox sustained an injury to her right eye. According to Cox, if Bullard's story was true, the left side of Cox's face should have been injured because that was "the natural contact point," yet in reality "the injury in this case was to the right." Feb. 19 PM Tr. 6:12–21. Cox did not put forward any expert testimony—medical or otherwise—to substantiate her suggestion that her injuries were inconsistent with Bullard's description of his use of force. And the Court does not find anything implausible about Bullard's testimony that his right hand struck the right side of

Cox's face. Right to left is not the only way that a person can strike someone, particularly given that Cox was actively resisting and not in a static position when Bullard punched her.

Further bolstering Bullard's testimony was its consistency with the testimony of Officer Adelmeyer—a Metropolitan Police Department officer who had little or "no personal stake" in the case. *United States v. Varella-Barragan*, No. 91-cr-251, 1992 WL 19118, at \*4 (D.D.C. Jan. 17, 1992). For instance, Adelmeyer confirmed Bullard's testimony that Cox kicked Adelmeyer in the face when he first came to help Bullard, and corroborated Bullard's account of a closet door falling on him and Cox while they were struggling. *Compare* Feb. 19 AM Tr. 51:6–9, *and id.* at 52:6–12, *with* Feb. 17 PM Tr. 32:10–13, *and id.* at 29:1–3. The Court's finding that Bullard was credible is central to its findings about what happened when Cox and Bullard were alone in the house and, for that reason, key to its legal conclusion that Bullard's use of force was privileged.

\*    \*    \*

The Court finds that plaintiffs have not met their burden to prove that the Government is liable and therefore enters judgment in its favor. The Court will issue a separate order consistent with these findings of fact and conclusions of law.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: April 10, 2026

15